UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

UNITED STATES OF AMERICA                                                                    PLAINTIFF

v.                                                                                      CASE NO. 3:10MJ-54-DW

JOHNNY LOGAN SPENCER, JR.                                                                   DEFENDANT

### **ORDER**

This matter came before the Court on Friday, February 19, 2010, for preliminary and detention hearings following the arrest of the Defendant, Johnny Logan Spencer, Jr., pursuant to a federal criminal complaint (DN 1). The criminal complaint charges that on or about February 12, 2010, in Jefferson County, Kentucky, Spencer violated 18 U.S.C. §871, among other statutes, when he knowingly and willfully made threats against the President of the United States of America.[1] The criminal complaint is supported by an affidavit of Secret Service Special Agent Stephan M. Pazienza.

Special Agent Pazienza alleges in his affidavit that on February 12, 2010, he received information from an FBI agent that an individual with the screen name "Pain1488" had recently posted a poem entitled, "The Sniper" on a website with the URL of NaziSpace/NewSaxon.org. This individual, Pain1488, was identified by the FBI agent to be the Defendant, Johnny Logan Spencer, Jr. According to the affidavit, the NaziSpace/NewSaxon.org website is a social networking website for white supremacists. The FBI agent transmitted a copy of the poem, The Sniper, to Special Agent Pazienza for his review.

---

[1] The complaint also charges that Spencer transmitted in interstate commerce a threat to injure another person in violation of 18 U.S.C. §875 and that he knowingly and willfully threatened to kill or inflict bodily harm on a major candidate for the office of President in violation of 18 U.S.C. §879. (DN 1, Complaint, p 1).

A copy of the text of "The Sniper" is set forth in the affidavit. It reads as follows:

"THE SNIPER"

As the tyrant enters his cross hairs the breath he takes is deep
his focus is square on the target as he begins to release
a patriot for his people he knows this shot will cost his life
but for his race and their existence it is a small sacrifice.

The bullet that he has chambered is one of purest pride
and the inspiration on the casing reads "DIE negro DIE"
He breathes out as he pulls the trigger releasing all his hate
and a smile appears upon his face as he seals that monkey's fate.

The bullet screams toward its mark bringing with it death
and where there was once a face there is nothing left.
Two blood covered agents stare in horror and dismay
looking down toward the ground where their president now lay.

Now the screams of one old negro broad pierces thru the air
setting off panic from every eyewitness that was there
and among all the confusion the hero calmly slips away
laughing for he know there will be another negro holiday.

(DN 1, Aff. p. 2, ¶5).[2]

Special Agent Pazienza's affidavit then continues in detail to relate the initially unsuccessful efforts of the Secret Service to locate Defendant Spencer in Louisville on Feb. 12 and 13, 2010. Spencer was finally located on February 16, 2010 at the Jefferson County Courthouse where he agreed to speak with Special Agent Pazienza at the local Secret Service field office. (*Id*. at ¶17).

---

[2] The poem set forth in the affidavit of Special Agent Pazienza contains at its conclusion the attribution "By Johnny Spencer." The affidavit does not advise whether this attribution was simply included in the fax transmitted by the FBI agent to Pazienza, or whether the poem as posted on the website included this attribution. The Court's understanding is that the poem posted on the white supremacy website did not directly name its author by his given name, but rather referred only to the username "Pain1488."

Once at the Secret Service office, Agent Pazienza directly asked Spencer about "The Sniper." Spencer allegedly accepted responsibility for writing, publishing and electronically linking his poem, "The Sniper," to the NewSaxon.org website and possibly to other white supremacy web sites. Spencer explained to Agent Pazienza that he originally wrote the poem approximately two years earlier following the death of his mother sometime in August of 2007. It was at approximately the same time that the U.S. Secret Service began to provide protection for presidential candidate Barack Obama, according to Pazienza.

Spencer confirmed to the agent that he was referring to the current President of the United States, Barack Obama, in his poem. He added, however, that he regretted his decision to author and post "The Sniper" and that he did not intend at any time to cause harm to anyone protected by the Secret Service. Spencer apologized for his actions and agreed to remove the poem immediately from the website. He further advised Agent Pazienza that he no longer affiliates himself with any white supremacist groups or engages in any of their activities. Spencer explained to the agent that he now uses such web sites as NewSaxon.org to check his e-mail and to socialize primarily with women (DN 1, Aff. p. 4, ¶20).

The United States called Secret Service Agent Pazienza to testify at the preliminary hearing. Agent Pazienza confirmed that all of the information set forth in his affidavit is true and accurate to the best of his knowledge. Agent Pazienza agreed, on cross-examination, that Spencer wrote the poem more than two years ago in November of 2007, that the poem never directly referred to President Obama, did not include any time reference, and finally, that no violence or breach of the peace attributable to the poem had occurred since it was written.

## LEGAL ANALYSIS

The role of the Court in this matter is established by the language of Rule 5.1 of the Federal Rules of Criminal Procedure, the Rule that relates to preliminary hearings. Under subsection (e) of Rule 5.1, the task of the Magistrate Judge is to determine whether there exists "probable cause to believe an offense has been committed and the defendant committed it." Fed.R.Crim.P. 5.1(e). *See United States v. King,* 482 F.2d 768,774-45 (D.C. Cir. 1973)("[T]he primary mission of the federal preliminary hearing is to establish the existence or nonexistence of probable cause to hold the accused for further proceedings...."). If the Magistrate Judge makes such finding of probable cause, then the Defendant is required to appear for further criminal proceedings in federal court. *Id*.

In this case, the primary offense charged is defined by 18 U.S.C. §871(a), a federal statute that forbids threats against the President of the United States and successors to the presidency. *Id.* The material language of the statute provides as follows:

> (a) Whoever knowingly and willfully deposits for conveyance in the mail or for a delivery from any post office or by any letter carrier or letter, paper, writing, print, missive, or document containing any threat to take the life of, to kidnap, or to inflict bodily harm upon the President of the United States, the President-elect, the Vice-President, or other officer next in order of succession to the office of the President of the United States, or the Vice-President elect, or knowingly and willfully otherwise makes any such threat against the President, President-elect, Vice-President or other officer next in the order of succession to the Office of the President or Vice-President-elect shall be fined under this title or imprisoned not more than five years, or both.

18 U.S.C. §871(a).[3] Accordingly, in light of the above language and the provisions of Rule 5.1,

---

[3] As noted, Defendant Spencer is additionally charged in the criminal complaint with the violation of 18 U.S.C. §875 and 18 U.S.C. §879. Section 875(c) provides that any person who

our task is to determine whether probable cause now exists to believe that Johnny Logan Spencer Jr., violated the prohibition against knowingly and willfully threatening to inflict bodily harm upon the President of the United States by his authorship and publication of the poem, "The Sniper," on the NaziSpace/NewSaxon.org website.

   Spencer's counsel argues forcefully that her client did nothing more than engage in protected free speech under the First Amendment by his publication of the poem, which cannot reasonably be found to constitute "fighting words," or a "true threat" to the President. The United States in response acknowledges the historic protection afforded to vigorous, even confrontational, debate on public and political issues as explained in *Watts v. United States*, 394 U.S. 705 (1969). The government insists, however, that the constitutional protection afforded to free speech is not absolute. Well-established limitations, the United States argues, remove First Amendment protection from those communications of minimal societal value such as the type of racial hatred-based threat of murderous violence to the chief executive of our country that pervades "The Sniper."

   These arguments require the Court to examine the history of 18 U.S.C. §871 and the federal case law of our circuit that interprets the provisions of the statute. The statute is of ancient origin. *See, Watts v. United States*, 394 U.S. 705, 709 (1969) (Douglas, J. concurring). One must return to fifteenth century England and the Statute of Treason, "which made it a crime

---

transmits in interstate or foreign commerce any communication containing any threat to kidnap any person or any threat to injure the person of another shall be fined or imprisoned not more than five years or both. 18 U.S.C. §875(c). The final statute, 18 U.S.C. §879(a)(3) provides that whoever knowingly and willingly threatens to kill, kidnap or inflict bodily harm upon a major candidate for the Office of President or Vice-President, or a member of the immediate family of such candidate ... shall be fined or imprisoned not more than five years, or both. 18 U.S.C. §879(a)(3).

to 'compass or imagine the Death of ... the King,'" to find the ultimate statutory source of 18 U.S.C. § 871. *Id* (citing Note, *Threats to Take the Life of the President*, 32 Harv.L.Rev. 724, 725 (1919)). As Justice Douglass explains in his concurrence in *Watts*, 394 U.S. at 710-711, the English Statute of Treasons initially migrated to America in the 1800s in the form of the Alien and Sedition Laws, which later in 1917 led the United States Congress to enact the current version of 18 U.S.C. §871. *See,* Act of Feb. 14, 1917, Ch. 64, 39 Stat. 919. *See gen.,* Note, *Conviction Under a Federal Statute for Threatening the Life of the President*.... 47 Tex.L.Rev. 712 (1969) (discussing *Watts*).

Over the decades since its enactment in 1917, the statute has been applied on multiple occasions in our federal circuit to hold criminal those individuals who express a contextually credible or "true threat" to kill, injure or kidnap the President or his successors.[4]

---

[4] *See, United States v. Miller*, 115 F.3d 361, 363-64 (6th Cir. 1997), *cert. denied*, 522 U.S. 883 (1997) (Michigan prisoner who threatened President Clinton and Vice-President Gore and their spouses, in a handwritten letter in which the prisoner claimed to have arranged the World Trade Center bombing, was properly convicted of violated 18 U.S.C. §871 despite his inability to directly carry out his threats and despite their irrational nature); *United States v. Glover*, 846 F.2d 339, 343-44 (6th Cir. 1988), *cert denied*, 488 U.S. 982 (1988) (Kentucky prisoner properly convicted of violating 18 U.S.C. §871 despite his incarceration at the time he and two other prisoners transmitted threatening letters to President Reagan where a reasonable person would realize that the receiver of the letters could perceive them to be a serious intention to inflict bodily harm or to take the life of the president); *United States v. Vincent*, 681 F.2d 462, 463-64 (6th Cir. 1982) (irate Michigan homeowner who verbally and physically confronted Secret Service agents sent to investigate threatening phone call made from homeowner's house on the day of attempted presidential assassination, who continued to threaten the President after being taken to a local psychiatric hospital, was properly convicted of violating 18 U.S.C. §871 where the jury could find that a reasonable person would have taken the defendant's statements seriously); *United States v. Lincoln*, 462 F.2d 1368, 1369-70 (6th Cir. 1972), *cert. denied*, 409 U.S. 952 (1972) (former Missouri prisoner, upset with the President for failing to respond to the prisoner's offer to serve his prison sentence in the military in Viet Nam, who warned Nashville Secret Service agents of alleged conspiracy to kill the President, was properly convicted of violating U.S.C. 871 where prisoner advised agents that if the conspiracy failed, he would go to the capitol and kill the President himself); *United States v. Olson*, 629 F. Supp. 889, 893-94

From these cited decisions of the Sixth Circuit, one may establish the fundamental test by which the violation of §871 is established. Our circuit has adopted an objective construction of §871. *Glover*, 846 F.2d at 343 ("This circuit has adopted an 'objective' construction of Section 871."). In other words, the subjective state of the defendant's mind is not what is determinative of whether the statute has been violated. This means that a defendant may be convicted under §871 even if he or she is not shown to harbor an actual, subjective intent to carry out a threat against a President or Vice-President. *Lincoln*, 462 F.2d at 1369 (adopting the rule announced in *Roy v. United States*, 416 F.2d 874, 877 (9th cir. 1969)). As explained in *Glover*:

> This Court therefore construes the willfulness requirement of the statute to require only that the defendant intentionally made a statement, written or oral, *in a context or under such circumstances wherein a reasonable person would foresee that the statement would be interpreted by those to whom the maker communicates the statement as a serious expression of an intention to inflict bodily harm upon or to take the life of the President* and that the statement not be the result of mistake, duress, or coercion. The statute does not require that the defendant actually intend to carry out the threat.

*Glover*, 846 F.2d at 343-44 (original emphasis) (citing *Vincent*, 681 F.2d at 464).

---

(W.D. Mich. 1986) (drunken Michigan bar patron, upset over Middle Eastern hostage crisis, who repeatedly telephoned the FBI in an effort to provoke a confrontation, and only threatened the President after being informed that the FBI would not investigate him unless he committed a federal crime, did not make a "true threat" where his statements were expressed in the context of his political views concerning President Reagan's foreign policies and were made for purposes other than harming the President); *United States v. Jasick*, 252 F. 931, 932-33 (E.D. Mich. 1918) (Michigan defendant who publicly stated that "if he could get to President Wilson he would shoot the blinded eye" and "that if he got the chance he would shoot President Wilson," was properly convicted of threatening the President under 18 U.S.C. §871 despite the conditional nature of the threats); *United States v. Stickrath*, 242 F. 151, 152-53 (S.D. Ohio 1917) (Ohio defendant who stated that "President Wilson ought to be killed. It is a wonder someone has not done it already. If I had the opportunity, I would do it myself," was properly subject to prosecution under 18 U.S.C. §871).

In fact, the statute as interpreted by the federal courts in this circuit does not even require that the defendant have the capacity to carry out the alleged threat so long as the challenged words satisfy the above test so as to be deemed a "true threat."  *See, Glover*, 846 F.2d at 344 (declining to hold as a matter of law that an incarcerated defendant, who was presently incapable of personally carrying out the threats contained in his letter, could not make a "true threat" prohibited by §871); *Miller*, 115 F.3d at 363-64 ("[T]he author's imprisonment does not automatically transmute a facially threatening letter into an innocuous prank.") (citing *Glover*, 846 F.2d at 344).  The psychological instability of the speaker or his or her manifest irrationality likewise do not protect the defendant from prosecution under §871 if the objective "true threat"standard of the statute is otherwise satisfied.  *Miller*, 115 F.3d at 364.  To determine whether the objective test for a true threat has been met so as to permit the matter to proceed to trial, the Court must examine the entire context in which the allegedly threatening statement was made.  *Miller*, 115 F.3d at 363 (citing *Watts*, 394 U.S. at 707-08).

Here, Defendant Spencer insists that his electronically posted poem is in no meaningful sense a "true threat," but rather is itself the essence of protected speech under the First Amendment to the U.S. Constitution.  Spencer is correct that the First Amendment does prohibit the Government from limiting or prohibiting otherwise protected speech, but such guarantee is not absolute.  *Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 245 (2002); *Chaplinsky v. New Hampshire*, 315 U.S. 568, 571-72 (1942).  Thus, for example, the free speech protection of the First Amendment does not reach to "certain categories of speech including defamation, incitement and obscenity, and pornography produced with real children."  *Doe v. Perry Community School District*, 316 F. Supp.2d 809, 822-23 (S.D. Iowa 2004)(quoting *Free*

*Speech Coalition*, 535 U.S. at 245-46). Likewise, "fighting words" also are not constitutionally protected speech. *R.A.V. v. City of St. Paul, Minn.*, 505 U.S. 377, 382-83 (1992) (citing *Chaplinshy*, 315 U.S. at 572), nor does the First Amendment cloak with free speech protection statements that are "true threats." *Virginia v. Black*, 538 U.S. 343, 359 (2003).

As the Supreme Court explained in *Chaplinsky*, 315 U.S. at 572, utterances that are "fighting words" or are "true threats" play no essential part in the public discourse of ideas and are considered to be of such slight social value in the search for truth that any benefit that might possibly be derived from them is greatly outweighed by the nation's interest in social order and morality. *Id.* In contrast, however, the full protection of the First Amendment will fall on those communications that are nothing more than political hyperbole, innocuous talk, jest or political discourse even if a listener may find such comments distasteful, rude, abrasive, repulsive or otherwise unsettling. *Watts*, 394 U.S. at 708 ("We must interpret the language Congress chose [in § 871] 'against the background of a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials.' The language of the political arena ... is often vituperative, abusive and inexact.") (citing *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964)); *Miller*, 115 F.3d at 363 ("[C]ommunications which convey mere political hyperbole, innocuous talk, jest or the like, are beyond the scope of the statute and further are insulated by the First Amendment.") (citing *Watts*, 394 U.S. at 707-08). *See gen., Rankin v. McPherson*, 483 U.S. 378 (statement by constable's office clerk, after hearing of the attempted assassination of President Reagan, that "if they go for him again, I hope they get him," made during a discussion concerning President

Reagan's reduction of welfare benefits and public services, did not amount to a punishable threat under §871, but rather dealt with a matter of public concern and was protected by the First Amendment).

Keeping in mind the above principles, and the judicial history of the statute, the Court turns now to the substance and the context of Defendant Spencer's poem, "The Sniper." First, the Court observes that the mere status of this statement as a poem per se does not, as a matter of law, negate the possibility that it is itself, or that it contains, a true threat. The Court has found no authority, judicial or otherwise, that persuasively holds for the proposition that because a statement vividly describing and praising the assassination of the President is set to verse no reasonable person therefore could foresee that an objectively rational recipient thereof would interpret its language to constitute a serious threat of an intent to harm, kidnap or kill the President so as to be a "true threat." *See gen., Miller*, 115 F.3d at 363 (citing *United States v. Smith*, 928 F.2d 740, 741 (6th Cir.), *cert. denied*, 502 U.S. 852 (1991)).

The same could be said for any other expressive means of communication that might marginally be described as being artful in its form. In other words, had Spencer carved the message into a stone sculpture, cross-stitched it on a pillow, or incorporated it into an oil-on-canvas painting, none of these various artistic media would, as a matter of law, negate the possibility that a reasonable juror might determine that the substance and context of such statements satisfy the "true threat" test of §871.

Indeed, the "true threat" test of *Watts* has been applied in a number of federal cases that fall outside the context of 18 U.S.C. § 871 to find various artwork, poetry and music created by students to constitute a "true threat" to fellow students and school administrators so as

to be unprotected by the free speech clause of the First Amendment. For example, in *Porter ex rel. LeBlanc v. Ascension Parish School Bd.,* 301 F. Supp.2d 576, 579-88 (M. D. La. 2004), *aff'd,* 393 F.3d 608 (5th Cir. 2004), *cert denied,* 544 U.S. 1062 (2005), the District Court for the Middle District of Louisiana held that the 2-year old drawing sketched by a 14-year old high school student, who depicted his school being soaked in gasoline with a missile aimed at it and with students holding guns and throwing a brick at the school principal while yelling racial expletives, met the objective test of *Watts,* since a reasonable person would have interpreted the student's drawing as a serious expression of an intent to cause present or future harm.

Similarly, in *Doe v. Pulaski County Special School Dist.,* 306 F.3d 616, 621-25 (8th Cir. 2002), the Eighth Circuit found that two violent, obscenity-riddled letters that set out the lyrics for future rap songs intended to be performed by a junior high student, who graphically described his desire to molest, rape and murder his ex-girlfriend, were not entitled to First Amendment protection given that the songs constituted "true threats." *Id.* at 621-25.  The U.S. District Court for the District of Massachusetts reached the same result under the *Watts* test in a third case in *Demers ex rel. Demers v. Leonminster School Dept.,* 263 F. Supp. 2d 195, 201 (D. Mass. 2003) wherein an 8th grade student with a history of disruptive behavior and substance abuse was expelled for drawing two pictures, one with the school surrounded by explosives as students cried for help from the windows and the other with the Superintendent of Schools with a gun pointed at this head and explosives at this feet. *Id.*(citing *Lovell v. Poway Unified School Dist,* 90 F.3d 367 (9th Cir. 1996)(applying the "true threat" doctrine set forth in *Watts*)).

These cases demonstrate that true threats may readily be found even when expressed in what would under normal circumstances be considered the context of the arts.

Accordingly, form is not the master of substance when it comes to the determination of whether words or images used by a defendant may constitute a "true threat" to the President of the United States.  *See gen, LaVine v. Blaine School Dist.,* 257 f.3d 981, 983-990(9th Cir. 2001)(poem entitled, "Last Words" that contained graphic description of Columbine-style massacre of 11th grade author's fellow high school students was not entitled to First Amendment protection under the separate test of *Tinker v. Des Moines Indep. Cmty. Sch. Dist.,* 393 U.S. 502(1969)).

       Here, neither party disputes the literal substance of "The Sniper."  The poem is solely and entirely dedicated to the assassination of the current President of the United States based only on his race.  It contains no other message or verbal imagery.  It expresses no larger theme or commentary on social or political issues of the day.  It is not jocular in any sense nor can it be fairly characterized as being satyrical or merely metaphoric.  It is not merely a portion of some larger work of fiction.

       The poem itself is not a creature of political discourse.  Nowhere in the poem is there any discussion of philosophical differences in governing or political ideology.  The poem instead is a vivid, chronological description of the assassination of the President.  It sets forth the method and means of such assassination to and including the proper breathing technique used when firing for maximum effect.  The poem expressly includes in the second verse the explicit threat "DIE negro DIE."  It continues to speak of the author's pleasure as he "seals that monkey's fate." (DN 1, Aff. p. 2, ¶5).  The poem concludes with the author's laughing knowledge that following the assassination of the President "there will be another negro holiday." (*Id*.).  This final line of the poem is a direct reference, in the Court's view, to the current national holiday created following the assassination of the late Rev. Martin Luther King,

who himself was fatally shot by a sniper in Memphis, Tennessee in 1968.

The poem is permeated throughout with racial hatred and racially disparaging terminology. Its admitted author, Defendant Spencer, posted the poem on the website of a white supremacy organization with the URL of NaziSpace/NewSaxon.org, which was linked to yet another white supremacy website of the National Socialist Movement with the URL of MSN88.com, an organization that sponsors the New Saxon organization. At one time, Defendant Spencer apparently was an active board member of the NewSaxon organization, although he claimed during his interview with Special Agent Pazienza that he is no longer affiliated with these white supremacist groups.

Nevertheless, Agent Pazienza's investigation revealed that Spencer continued to electronically access the New Saxon website as recently as Feb. 15, 2010. Examination of the web sites themselves reveals the existence of a 25-point manifesto referred to as a "party thesis" on the website of the National Socialist Movement. Points 4 and 5 of the party thesis state the principle that only individuals of "pure white blood" may be members of the nation and that only such pure white citizens may hold public office. Thus, the publicly-stated philosophy of the National Socialist Movement, a sponsor of NewSaxon.org website, is that only whites may be U.S. citizens and only whites may hold elected office, in direct contrast to our current President who is of mixed racial lineage.

The Court also takes into consideration the personal history of Defendant Spencer in determining whether probable cause exists to believe that his poem contains a true threat to the President. Defendant Spencer has a prior criminal history and has been previously incarcerated. At the time of Special Agent Pazienza's investigation in Feb. of 2010, Spencer was

on parole; however, he was in violation of the conditions of such parole due to his failure to timely report and his positive test for drug use. Additionally, Spencer has no permanent, stable home address or employment that would confirm his status as a responsible, law-abiding citizen of the community.

It is true, as reflected in Agent Pazienza's affidavit, that Spencer has now renounced any serious intent to inflict harm on the President. He additionally has expressed his regret for his authorship and publication of the subject poem. Further, various members of his family testified recently at the preliminary hearing that Spencer would not act violently upon his perceived racial bias. Accepting these considerations as being accurate and truthful, they run only to the subjective state of mind of Spencer. As such, they miss the mark.

The focus of the test is not on Spencer's state of mind, either when he authored the poem or when he published it on the website. Rather, the focus is an objective one that asks how a rational recipient of Spencer's poem would interpret its language as a possible, serious expression of intent to harm or kill the President. From that perspective, the Court has little difficulty in concluding, given the language and the context in which the poem was published, along with the history of the Defendant, that probable cause exists to believe that a reasonable juror could find that the poem, "The Sniper," constitutes a true threat against the life of the President of the United States so as to constitute a violation of 18 U.S.C. §871, as well as the remaining charged statutes, 18 U.S.C. §§875, 879.

Spencer's counsel argued forcefully throughout the preliminary hearing that Spencer's poem cannot be considered to be "fighting words" so as to fall outside the protection of the First Amendment for free speech. Counsel cited to the Court several "fighting words"

14

cases wherein various federal courts determined that challenged statements did not constitute "fighting words." *See, Purtell v. Mason*, 527 F.3d 615, 617-20, 622-25 (7th Cir. 2008), *cert. denied*, 129 S. Ct. 411 (2008) and *United States v. Lincoln*, 403 F.3d 703, 704-07 (9th Cir. 2005). Spencer is correct that in both the *Purtell* and the *Lincoln* decisions the respective appellate courts found that the challenged statements, tombstones in the case of *Purtell* and threatening statements written in a prisoner's workbook in *Lincoln*, did not fall within the category of "fighting words" so as to be outside the protection of the First Amendment.

The Court does not disagree with the holding of either *Purtell* or *Lincoln*. Both decisions, however, deal with a separate analytical branch of the same First Amendment tree to the extent that they focus upon "fighting words" rather than "true threats." In *Virginia v. Black*, 538 U.S. at 358-60, the U.S. Supreme Court explained that fighting words are those words that "'by their very utterance inflict injury or intend to incite an immediate breach of the peace.'" *Id.* (citing *Chaplinsky*, *supra*. at 572). The Court in *Black* immediately continued to explain that it has "held that fighting words - - 'those personally abusive epithets, which, when addressed to the ordinary citizen are, as a matter of common knowledge, inherently likely to provoke violent reaction' - - are generally proscribable under the First Amendment." *Black*, 538 U.S. at 350 (citing *Cohen v. California*, 403 U.S. 15, 20 (1971)). Thus, fighting words, unlike true threats, are those words which provoke an immediate violent reaction by the listener.

True threats, on the other hand, are judged by a different standard, as discussed above, one which asks whether the objective listener would consider the challenged statement to be a serious expression of intent to commit an act of unlawful violence upon a particular group or individual, such as the President of the United States. *See, Miller*, 115 F.3d at 363 ("[I]f a

reasonable person would perceive that an objective rational recipient of the statement would interpret its language to constitute a serious expression of intent to harm, kidnap or kill the President or other statutorily protected target, that message conveys a '"true threat."') The two concepts therefore are not synonymous as is recognized by the very decision relied on by Spencer, *Purtell v. Mason*, 527 F.3d at 623 n. 3 (distinguishing fighting words from true threats). *See also*, *Doe*, 316 F. Supp. 2d at 822-23; *Vives v. City of New York*, 305 F. Supp.2d 289, 298-99 (S.D. N.Y. 2003), *reversed in part*, 405 F.3d 115 (2nd Cir. 2005); *Holley v. County of Orange, New York*, 625 F. Supp.2d 131, 140 (S.D. N.Y. 2009). Consequently, even if a reasonable juror could not find probable cause to believe that Spencer's poem constituted "fighting words," a question the Court does not address herein, such a determination would not resolve the question of whether "The Sniper" constitutes a true threat to the life of the President in violation of 18 U.S.C. §871.

      The Court concludes, after looking at the totality of the circumstances and the textual context in which the poem was created and posted, that probable cause does indeed exist to believe that Spencer has violated 18 U.S.C. §§871, 875 and 879 so as to warrant his further prosecution under these statutes.

February 25, 2010

Dave Whalin, Magistrate Judge
United States District Court

Copies to Counsel of Record